[Cite as *In re D.B.*, 2016-Ohio-7910.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

BUTLER COUNTY

| | | |
|---|---|---|
| IN THE MATTER OF: | : | |
| D.B. | : | CASE NO. CA2016-04-067 |
| | : | O P I N I O N<br>11/28/2016 |
| | : | |
| | : | |

APPEAL FROM BUTLER COUNTY COURT OF COMMON PLEAS
JUVENILE DIVISION
Case No. JN2013-0190

D. Joseph Auciello, Jr. 306 South Third Street, Hamilton, Ohio 45011, for appellant, L.B.-I.

Mary Lou Kusel, 6 South Second Street, Suite 317, Hamilton, Ohio 45011, for appellees, J.B. and A.G.

Michael T. Gmoser, Butler County Prosecuting Attorney, Lina N. Alkamhawi, Government Services Center, 315 High Street, 11th Floor, Hamilton, Ohio 45011, for appellee, Butler County Department of Job & Family Services

Carol Garner, 9435 Waterstone Blvd., Suite 140 Cincinnati, Ohio 45249, guardian ad litem

**PIPER, J.**

{¶ 1} Appellant, L.I.-B. ("Mother"), appeals a decision of the Butler County Court of Common Pleas, Juvenile Division, granting legal custody of her child to the child's maternal uncle ("Uncle").

{¶ 2} Butler County Children Services ("the Agency") filed a complaint alleging that Mother's child, D.B., was an abused and dependent child. The Agency's allegations of abuse and dependency were predicated upon a report that D.B. and Mother were abused by Mother's boyfriend. The complaint alleged that D.B. witnessed an instance of domestic violence between Mother and her boyfriend, and that Mother asked D.B. to call 9-1-1. However, Mother's boyfriend threatened to "kill both of them," and the child did not call 9-1-1. The other allegations included that Mother's boyfriend threw the child against the wall during another instance of domestic violence.

{¶ 3} After the child was adjudicated dependent, D.B. remained in Mother's care under protective supervision. As a condition of protective supervision, the court ordered no contact between D.B. and Mother's boyfriend. Subsequently, the Agency was forced to remove the child from Mother's care when she married her boyfriend, and allowed the contact previously prohibited by the court.

{¶ 4} Mother's case plan with the Agency had included domestic violence and mental health assessments, and a requirement to follow any recommendations arising from the assessments. While Mother completed the mental health assessment, she did not initially complete the domestic violence assessment. Despite the child witnessing the event, Mother denied the claim that her then-boyfriend committed domestic violence against her. After D.B. was removed from her home, Mother completed a domestic violence course, as well as anger management. Mother also participated in a psychological evaluation. The results of the evaluation included a recommendation that Mother complete parenting classes. However, Mother became reluctant to complete the Agency's plan and finish the classes. The Agency made no any further referrals given Mother's reluctance and hesitancy to work at completing the Agency's plan.

{¶ 5} Meanwhile, D.B. was placed with Uncle and did well in his care. His grades

improved, he started to receive tutoring, and he began participating in several extracurricular activities. Uncle also facilitated visitation between D.B. and his biological father ("Father"), with whom D.B. was beginning to form a relationship. After D.B. had lived with Uncle and his live-in girlfriend for approximately a year, Uncle moved for legal custody.

{¶ 6} While the Agency supported Uncle's motion, Mother opposed Uncle having custody of D.B., indicting she wanted to reunify with her child. Father also opposed the motion, and asked the juvenile court to award him custody. Uncle's motion was heard by a magistrate. During the hearings, Mother testified that she was aware of the no-contact order, and that despite the order, she married the man with whom D.B. was to have no contact. Mother even had D.B. attend the wedding. Mother testified that she would divorce her husband if it meant that she could regain custody. The magistrate also heard testimony from an Agency caseworker who testified that Mother's husband did not complete the case plan items suggested by the Agency, and that he had a notable criminal history, which included violent crimes.

{¶ 7} After the hearings, the magistrate granted Uncle legal custody, and Mother filed objections. The juvenile court held a hearing on Mother's objections, and overruled them. The juvenile court then adopted the magistrate's decision awarding Uncle legal custody. Mother now appeals the juvenile court's ruling, raising the following assignment of error.

{¶ 8} THE TRIAL COURT ERRED BY FINDING CLEAR AND CONVINCING EVIDENCE TO SUPPORT TRANSFER OF LEGAL CUSTODY TO A RELATIVE FINDING THE FACTORS OF R.C. 3109.04(F)(1) PRESENT.

{¶ 9} Mother argues in her assignment of error that the juvenile court erred in granting legal custody of D.B. to Uncle.

{¶ 10} R.C. 2151.353(A)(3) provides that if a child is adjudicated a dependent child, the court may award legal custody of the child to either parent or to any other person who,

- 3 -

prior to the dispositional hearing, files a motion requesting legal custody of the child. Legal custody vests in the custodian the physical care and control of the child while residual parental rights and responsibilities remain intact. *In re M.M.*, 12th Dist. Fayette No. CA2010-12-034, 2011-Ohio-3913, ¶ 7. Unlike permanent custody, granting legal custody does not terminate the parent-child relationship. *Id.* A juvenile court "may award legal custody to a nonparent upon a demonstration by a preponderance of the evidence that granting legal custody to the nonparent is in the child's best interest." *In re C.A.*, 12th Dist. Butler No. CA2014-07-165, 2015-Ohio-1410, ¶ 13. A preponderance of the evidence is evidence that is of a greater weight or more convincing than the evidence which is in opposition to it. *In re L.A.B.*, 12th Dist. Fayette No. CA2012-03-008, 2012-Ohio-5010, ¶ 12.

{¶ 11} A juvenile court must base its custody determination on the best interest of the child. R.C. 3109.04. As pertinent to the case at bar, and in determining the best interest of the child, R.C. 3109.04(F)(1) requires the juvenile court to consider all relevant factors, which include:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state

{¶ 12} An appellate court reviews a juvenile court's custody determination for an abuse of discretion. *In re C.A.*, 2015-Ohio-1410 at ¶ 15. The juvenile court's exercise of its discretion in custody matters is entitled to the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. *Id.* Thus, an appellate court will afford deference to the juvenile court's findings regarding the credibility of the witnesses. *Id.*

{¶ 13} In considering a claim that the juvenile court's decision is contrary to the

manifest weight of the evidence, "a reviewing court must determine whether the finder of fact, in resolving conflicts in the evidence, clearly lost his way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *In re X.B.*, 12th Dist. Butler No. CA2014-07-168, 2015-Ohio-1174, ¶ 21. The reviewing court is guided by the presumption that the juvenile court's findings are correct. *Id.* Thus, where an award of custody is supported by a substantial amount of credible and competent evidence, the reviewing court will not reverse the juvenile court's custody determination on the grounds that it is contrary to the manifest weight of the evidence. *Id.*

{¶ 14} After reviewing the record, we find that the juvenile court's custody determination was supported by the preponderance of the evidence, and was not contrary to the manifest weight of the evidence. The magistrate fully reviewed and balanced the statutory factors. The magistrate gave consideration to the parent's wishes for the child. Mother asked the court to return D.B. to her custody, and opposed Uncle's motion for legal custody. While Father also asked for custody, he did not oppose Uncle having legal custody of D.B. Nor did Father deny that the child was "good" with Uncle. The child was not interviewed, and the court did not learn of the child's wishes. Even so, the child's guardian ad litem suggested that Uncle have legal custody.

{¶ 15} Regarding the child's interaction and interrelationship with the people in his life, the court considered that D.B. was in Mother's custody, even after being adjudicated dependent, until he was removed when Mother violated the no-contact order by having D.B. around the man who mistreated D.B. While the child loves Mother, and was happy in her care, the record also demonstrates that Mother was not actively involved in the child's schooling or activities once he began living with Uncle. Nor did Mother acknowledge the child's birthday or Christmas, and also did not allow the child to take past gifts she had given

him to Uncle's home.[1] Mother's visitation with the child had to be supervised, as she was prone to having "inappropriate conversations" with the child about his removal from her home. Within six months of the hearing, Mother refused to communicate with Uncle, and often changed her phone number without notifying him of the change.

{¶ 16} Despite there being a no-contact order, Mother facilitated contact between the child and his abuser. During Mother's testimony, she confirmed that she was fully aware of the no-contact order, and in spite of it, she chose to marry the man despite knowing her new husband could not have any contact with D.B. pursuant to court order. Mother continues to live with her husband.

{¶ 17} Mother's husband, though he was fully aware of the no-contact order, directly communicated with the child, and on one occasion, suggested that the child physically assault another child with whom D.B. was having conflict. The court also heard testimony from Mother's husband that his criminal history included aggravated burglary, aggravated menacing, burglary, arson, and parole violations. Mother's husband, despite completing alcohol and drug assessments, tested positive for marijuana during the pendency of the proceedings. The magistrate specifically found that Mother's husband having contact with the child was "overall detrimental to the child."

{¶ 18} Father has had little contact with the child during D.B.'s life, and only recently began to establish a relationship with the child. Father acknowledged that when the child was younger, he disciplined D.B. by smacking him in the mouth, causing his lip to split, bleed, and bruise. The child stayed very briefly with Father before the Agency placed the child with Uncle, but Father refused to keep the child permanently. Since that time, however, Father

---

1. On cross-examination, Mother testified that she did not get D.B. Christmas gifts, and stated, "I didn't get him nothing because I didn't, I ain't have no money. I don't work." The record indicates that Mother receives Social Security disability payments of $659 per month.

tried to initiate a relationship with the child, and was granted supervised visitation. The magistrate found that Father and D.B. are still in the process of "fully developing a bond." Conversely, the child has thrived with Uncle, and has a loving bond with Uncle and Uncle's girlfriend. The child acts as a member of Uncle's household and has adjusted well to life in Uncle's care.

{¶ 19} The court also considered the child's adjustment to his home, school, and community. The record demonstrated that D.B. is "very comfortable" in his home with Uncle, and had done better in school than he had before. The child has also become involved in activities and sports, and continues to receive tutoring in school. The child, who demonstrated aggressive behaviors when first placed with Uncle, has shown improved behavior, and interacts well with Uncle's son. According to Uncle's girlfriend, since joining Uncle's household, the child "kind of enjoys life. He has a good time and he's not always looking behind his, his [sic] back." Uncle's girlfriend also testified that D.B. has many friends in the neighborhood. The Agency caseworker testified that when she visited D.B. in Uncle's home, the child was "comfortable, talkative, friendly, polite."

{¶ 20} While Uncle's home is somewhat small and cluttered, the court specifically determined that such did not create any safety concerns related to the child. The record also demonstrates that Uncle passed a home study performed by the Agency. Conversely, Mother had moved from her former residence to a location that the child had never visited. The child had only recently begun overnight visits with Father.

{¶ 21} Regarding the mental and physical health of the parties, the court considered that Mother's psychological evaluation indicated that she needed counseling. However, Mother's reaction to the counseling suggestion demonstrated to the Agency that counseling attempts would be unsuccessful due to Mother's "defensiveness," "basic unwillingness to engage in those types of services," and "her lack of motivation and wiliness to participate."

The Agency caseworker testified that when she tried to address counseling with Mother, Mother "got angry," and "didn't want to continue talking."

{¶ 22} Mother's husband was diagnosed with Bipolar Disorder and suffers anxiety, and Father suffers from post-traumatic stress disorder. Uncle is on dialysis and had only one kidney that does not function property. However, he testified that his condition does not interfere with his ability to parent D.B.

{¶ 23} The court also considered that while Uncle has facilitated visitation between the child and Father, Mother did not. The record indicates that Mother does not communicate with Father, and testified that she does not get along with others in D.B.'s life. The magistrate found Mother's ability to honor and facilitate D.B.'s visitation with Father as "questionable at best."

{¶ 24} The court gave consideration to other statutory factors, noting that the child was adjudicated a dependent child after the Agency raised safety concerns specific to the child's contact with Mother's husband. Mother's husband, who has a violent criminal history, continued to have contact with the child despite the court's no-contact order. The child also expressed his concerns to Uncle about domestic violence that he witnessed between Mother and her husband. Mother and her husband continued to deny any domestic violence in their relationship, and at the time of the hearing, Mother's husband continued to live with her.

{¶ 25} The court acknowledged that Mother and her husband did complete some of the case plan actions set forth by the Agency. However, neither had shown the ability to implement the lessons taught in the courses they attended. For example, Mother demonstrated anger toward the Agency caseworker, yelled at the caseworker, and hung up on her. Mother's husband was inappropriate with the caseworker, such as screaming in the caseworker's face, using profanity with her, and displaying signs of aggression such that the Agency refused to let the caseworker return to the residence due to concern for the

caseworker's safety.

{¶ 26} Moreover, Mother refused to admit that any domestic violence occurred between herself and her husband, or her husband and D.B. Mother's refusal was directly contradicted by testimony that domestic violence between Mother and her husband was an ongoing issue and that such concerns were never alleviated. Mother, despite knowing of the no-contact order, chose to marry her husband, and continues to reside with him despite her marriage and cohabitation being the barrier to reunification with her son. The magistrate specifically found that Mother never abided by the no-contact order, and that she was incapable of protecting D.B. "from harm." Further, the magistrate questioned Mother's ability to make "good judgments in her life," and noted Mother's unwillingness to complete all case plan actions intended to improve her life and move toward reunification with D.B.

{¶ 27} Despite Mother making some progress on her case plan, she refused to complete the necessary actions to work toward reunification, and she continues to reside with a man who has been ordered to have no contact with the child. Conversely, the child is doing well while in Uncle's care, and is slowing building a relationship with Father. As such, we find that the juvenile court did not abuse its discretion in finding that Uncle having custody of D.B. was in the child's best interests. Mother's assignment of error is, therefore, overruled.

{¶ 28} Judgment affirmed.

M. POWELL, P.J., and S. POWELL, J., concur.